UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| WILLIAM E. HARRIS,<br><br>    Plaintiff<br><br>v.<br><br>H. WICKHAM, et al,<br><br>    Defendants | Case No.: 3:20-cv-00557-MMD-CSD<br><br>**Report & Recommendation of<br>United States Magistrate Judge**<br><br>Re: ECF No. 91 |

This Report and Recommendation is made to the Honorable Miranda M. Du, Chief United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' motion for partial summary judgment. (ECF Nos. 91, 91-1 to 91-3, 93-1 to 93-23.) Plaintiff filed a response. (ECF Nos. 101, 104-1 to 104-2.) Defendants filed a reply. (ECF No. 106.)

After a thorough review, it is recommended that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC). When he filed this action, he was proceeding pro se. However, he was subsequently appointed pro bono counsel. Plaintiff brings this action pursuant to 42 U.S.C. § 1983 and Article I, Section 6 of the Nevada Constitution. (Amended Complaint, ECF No. 43.) The events giving rise to this action took place while Plaintiff was housed at Northern Nevada Correctional Center (NNCC). (*Id.*)

Plaintiff alleges that in September 2019, he was housed in Unit 2 at NNCC, with other inmates, including inmate Pamplin. He claims that he sent inmate request forms (known as "kites") to defendants Benjamin Murphy, Sylvia Irvin, and Candice Madieros (mistakenly named by Plaintiff as Medeiros) between September 3 and September 13, 2019, stating that he feared for his safety due to aggressive, homophobic and threatening behavior Pamplin directed at Plaintiff. He asked that he be moved out of Unit 2. Plaintiff alleges that his requests went unanswered, and on September 15, 2019, he was brutally assaulted by Pamplin while he was sleeping. Pamplin used his medically-issued cane as a weapon, inflicting multiple lacerations, abrasions and contusions to Plaintiff's head, face, left eye and body. He claims that Murphy, Irvin and Madieros violated the Eighth Amendment and Article 1, Section 6 of the Nevada Constitution when they ignored his requests to move out of the unit.[1]

Plaintiff goes on to allege that after the attack defendants Drs. Alley and Naughton (senior physicians at NNCC) failed to promptly get Plaintiff appropriate medical care, and NNCC psychologist Gamarra-Hoff failed to promptly get Plaintiff appropriate psychological care, in violation of the Eighth Amendment and Article I, Section 6 of the Nevada Constitution.

Defendants move for partial summary judgment as to the Eighth Amendment deliberate indifference to serious medical needs claim, arguing that Plaintiff received appropriate treatment; the Defendants are only responsible for their own actions and cannot control outside providers or other NDOC medical personnel; and, they are entitled to qualified immunity because the law was not clearly established that a failure to treat an inmate immediately with a specific course of treatment violates the Eighth Amendment.

---

[1] Plaintiff filed a motion for partial summary judgment as to the Eighth Amendment failure to protect claim, which has been addressed in a separate report and recommendation. (ECF No. 107.)

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and

determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the

pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Eighth Amendment Deliberate Indifference to Serious Medical Needs Standard**

"The government has an 'obligation to provide medical care for those whom it is punishing by incarceration,' and failure to meet that obligation can constitute an Eighth Amendment violation cognizable under § 1983." *Colwell v. Bannister,* 753 F.3d 1060, 1066 (9th Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976)).

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle*, 429 U.S. at 104. A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104); *see also Akhtar*, 698 F.3d at 1213.

If the medical need is "serious," the plaintiff must show that the defendant acted with deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action

under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted). Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *Stewart v. Aranas,* 32 F.4th 1192, 1195(9th Cir. 2022) (citing *Shapley v. Nev. Bd. of State Prison Comm'rs,* 766 F.2d 404, 407 (9th Cir. 1985)); *McGuckin*, 974 F.2d at 1060.

"A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (citing *Sanchez v. Vild*, 891 F.2d 240, 241 (9th Cir. 1989), *overruled on other grounds in Peralta v. Dillard*, 774 F.3d 1076 (9th Cir. 2014). Instead, to establish deliberate indifference in the context of a difference of opinion between a physician and the prisoner or between medical providers, the prisoner "'must show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's health.'" *Snow*, 681 F.3d at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

///

6

**B. Drs. Alley and Naughton**

    **1. Medical Evidence**

Plaintiff was seen by a nurse and Dr. Alley two days after the assault. Plaintiff noted he no longer had pain in his face, but it was hard to open his mouth wide to eat due to swelling. He had a left eye subconjunctival hemorrhage, as well as superficial lacerations and abrasions to the left eye, right cheek, left jawline, the left upper back, and left upper arm, as well as the left upper abdomen. He was ordered artificial tears as needed, and to see the eye doctor the following day for the eye trauma. (ECF Nos. 93-2, 93-3.) On September 18, 2019, Dr. Seljestad (the optometrist) saw Plaintiff and ordered Pred Forte and Tobramycin for ten days.[2]

On October 3, 2019, Plaintiff was seen in the clinic for a nurse appointment for continuing complaints after the assault, including right knee pain with ambulation and a clicking, popping, snapping sensation. He also reported that he was seeing a "halo-like starburst" in the left eye while looking right, as well as constant headaches in the frontal area. He said he was unable to take a deep breath due to rib pain, and he was not able to open his jaw wide enough to eat. It was noted that he had 20/50 right and 20/70 left visual acuity (presumably uncorrected), and optometry showed 20/25 right and 20/40 left visual acuity on September 18, 2019. The provider states that based on the statements/demeanor of the inmate and equal pupils and peripheral vision he did not need emergent eye care, but he would be scheduled with the optometrist the following week for a follow up. (ECF Nos. 93-2, 93-4.)

---

[2] Pred Forte is a steroid medicine used to treat eye inflammation. *See* Pred Forte ophthalmic Uses, Side Effects & Warnings (drugs.com), last visited October 26, 2023. Tobramycin is an antibiotic used to fight bacterial infections in the eyes. *See* Tobramycin ophthalmic Uses, Side Effects & Warnings (drugs.com), last visited October 26, 2023.

Plaintiff saw Dr. Naughton on October 9, 2019, and he had multiple complaints, including regarding his head, eye, neck, shoulder, and arm. He stated that he could not open his jaw all the way, and he reiterated seeing halos. (ECF No. 93-4 at 2.) Elavil was ordered, and Plaintiff was referred to the dental clinic for his jaw pain, and the eye clinic for his eyes. Dr. Naughton also ordered x-rays of the cervical spine, jaw/head, lumbar spine, ribs, and right knee. (ECF No. 93-5 at 2.)

He was ordered ibuprofen on October 14, 2019. (ECF No. 93-5 at 2.) X-rays were taken on October 14, 2019. The x-ray of the skull showed no facial fracture. He had degenerative changes in the cervical spine. The x-ray of the chest and ribs was unremarkable, as was the x-ray of the right knee. The x-ray of the lumbar spine showed degenerative changes but no acute fracture. (ECF No. 93-6.)

On November 10, 2019, Dr. Alley re-sent a request for an MRI of the cervical spine from June 26, 2019 (before the assault), since the authorization was apparently not previously done. He was to be scheduled with a provider regarding the use of Lyrica and lab tests. (ECF No. 93-5 at 2.)

On December 4, 2019, a request was made for an MRI of the brain and orbits to rule out optic radiation/brain inflammation per the recommendation of Dr. Seljestad. (ECF No. 93-7 at 2.)

On December 11, 2019, an ophthalmology consultation regarding eye photophobia and pain were ordered, as well as a follow up with Dr. Doyle (the neurologist). (ECF No. 93-9 at 2.) There is an order on December 19, 2019, to follow up on the status of the brain MRI requested on December 4, 2019. (ECF No. 93-9.) Ibuprofen was ordered for pain as needed on December 30, 2019. (*Id.*)

Plaintiff had an MRI of the orbits/face/neck on January 13, 2020, and mild edema and enhancement of the right intraorbital optic nerve was suspected, though the orbits were significantly motion degraded. (ECF No. 93-8.)

There was an order on January 21, 2021, to schedule a provider review of the recent cranial imaging and to discuss Plaintiff's "Elavil situation." (ECF No. 93-11.) It was also ordered that the orbit MRI be sent to Dr. Wolff, noting Plaintiff had an appointment on January 23, 2020. (*Id.*)

Plaintiff saw ophthalmologist Dr. Wolff on January 23, 2020. Dr. Wolff noted that Plaintiff was referred by Dr. Seljestad for suspected prechiasmal lesion, light sensitivity, and left eye pain with movement. Plaintiff reported he had loss of taste and smell and his vision was blurred. Plaintiff's uncorrected visual acuity was 20/60+2 on the right, and 20/60-1 on the left. Dr. Wolff's impressions after the examination were: ocular hypertension, bilateral photophobia and ocular motility disorder. The plan was for Plaintiff to use Timolol drops in both eyes daily, as well as a brain MRI, if not performed recently[3], and a neurological evaluation. (ECF No. 93-10.) Dr. Naughton ordered the Timolol drops that day. (ECF No. 93-11.)

On January 27, 2020, there is a notation to follow up with Dr. Doyle to review the brain MRI and cervical spine MRI, and have the referral coordinator contact Dr. Wolff's office to see if they need to have a follow up appointment for Dr. Wolff to review the brain orbit MRI since that result was not reviewed by Dr. Wolff at the January 23, 2020 visit. (*Id.*) A request for consultation with Dr. Doyle for a follow up was made by Dr. Alley that day. This was authorized on January 31, 2020. (ECF No. 93-12.) Elavil was ordered on February 10, 2020. (ECF No. 93-11.)

---

[3] Plaintiff had just had an MRI on January 13, 2023.

Plaintiff saw Dr. Doyle on May 15, 2020. He noted Plaintiff's reports of symptoms after the assault including impairment of vision in the right eye, impairment of smell and taste, chronic headaches, and tinnitus. On examination, he did not detect reactivity in the pupils because of apparent photophobia. There was esotropia of the left eye which appeared to be somewhat variable on extraocular motility testing. His visual acuity bilaterally was markedly impaired. While Plaintiff did not see Dr. Doyle standing in front him when they first met and Plaintiff could not count fingers, Plaintiff was able to reach down and pick up his cane off the floor without difficulty.

During the cranial nerve examination, Plaintiff abruptly could hardly speak or protrude his tongue, but that resolved shortly thereafter. Initially, his left arm seemed quite rigid with a dystonic posture, but this resolved during the gait assessment. Plaintiff denied temperature sensation in the face as well as vibratory perception in the frontalis area.

Dr. Doyle's impression was that Plaintiff had apparent left ocular trauma after the assault resulting in esotropia and subsequent development of multiple other neurological symptoms, some of which were variable during the exam and appeared to have a non-physiological basis. It was Dr. Doyle's impression that the left optic nerve abnormality was related to the trauma with a possible injury to the extraocular motility musculature or perhaps the left sixth cranial nerve. The etiology of some of the other ocular symptoms, including the right monocular visual acuity deterioration, was unclear. The plan was to repeat the MRI of the brain to rule out any potential cranial nerve lesions, do some labs, and continue the ibuprofen, which Plaintiff reported was effective. He was also to follow up with ophthalmology. (ECF No. 93-13.)

Dr. Alley requested the brain MRI on May 18, 2020, which was authorized on May 20, 2020. (ECF No. 93-14.)

Plaintiff had the brain MRI on August 17, 2020. There were no acute intracranial or orbital findings identified, and there was no convincing enhancement or evidence of optic neuritis. There were stable microvascular chronic demyelination changes in the frontal and parietal white matter. (ECF No. 93-15.)

Plaintiff was seen on March 10, 2021, to discuss Lyrica, which Plaintiff stated he did not need anymore after reporting he did not want to come to the pill line. (ECF No. 93-16.)

Plaintiff saw Dr. Doyle again on July 29, 2021. Plaintiff reported that his symptoms had worsened, and he had minimal visual acuity bilaterally, hearing loss with tinnitus, loss of smell and taste, loss of temperature sensation in the extremities, and emotional lability. Dr. Doyle noted the MRI of the brain in August showed some apparent microvascular changes most consistent with small vessel disease, but the optic nerves did not demonstrate obvious changes consistent with optic neuritis. He discussed that the optometrist's report indicated abnormalities to suggest occipital lobe infarction. After examining Plaintiff, Dr. Doyle's impressions were as follows: left monocular esotropia with visual impairment secondary to prior trauma. Dr. Doyle stated that at least some of his newer symptoms were consistent with a functional disorder. He recommended a repeat brain MRI. (ECF No. 93-19.)

On August 3, 2021, Dr. Naughton ordered the brain MRI and a follow up with Dr. Doyle. The brain MRI appointment was made for October 22, 2021. (ECF Nos. 93-17, 93-18.)

The October 22, 2021, brain MRI was unremarkable. (ECF No. 93-20.)

In support of their motion for partial summary judgment, Defendants present an expert report from Dr. David Hellerstein opining that Dr. Alley and Dr. Naughton responded promptly and thoughtfully to Plaintiff's medical needs, including requests for medication changes and specialty referrals. (ECF No. 93-1.) Dr. Hellerstein's report references various medical records,

including records from optometrist Dr. Seljestad and the dental clinic, that were not submitted to the court. However, Plaintiff does not dispute the accuracy of Dr. Hellerstein's summary of those records. Plaintiff argues there are voluminous medical records and kites *not* included with Defendants' exhibits, but Plaintiff only submitted a handful of additional kites and a medication summary in his response to Defendants' motion.

**2. Analysis**

Plaintiff alleges that Dr. Alley and Dr. Naughton failed to promptly seek appropriate medical care for Plaintiff. (ECF No. 43 at 7.)

Defendants argue the evidence reflects that Plaintiff was treated and evaluated by multiple outside specialists at the request of Drs. Alley and Naughton. He had multiple MRIs as well as other testing and was followed for his condition, and their requests were made in a timely fashion and delays are not attributed to them.

In his response, Plaintiff argues there was a delay in diagnosing his conditions in the early months following his injuries which "foreclosed treatment with available modalities," such that a reasonable jury could find "that the available modalities would become less efficacious."

Defendants have presented evidence that following the assault, Plaintiff was seen and given medication and imaging by nurses as well as Drs. Naughton and Alley, and these doctors timely made requests and referrals for Plaintiff to be seen by various specialists, including an optometrist, ophthalmologist, neurologist, and dental. The recommendations of these specialists for further referral visits and MRI imaging were timely requested.

Plaintiff does not identify what specific diagnoses were delayed or what treatment was foreclosed. Nor does Plaintiff argue, let alone point to evidence, that the delays led to further injuries (or what those injuries are) or evidence that the delays are actually attributable to Drs.

Alley and Naughton. To the extent that Plaintiff disagrees with a course of treatment, he has not presented evidence that the course his treatment took was medically unacceptable under the circumstances and chosen in conscious disregard to a risk to Plaintiff's health.

In sum, the court finds that Defendants have submitted evidence demonstrating that Drs. Alley and Naughton were not deliberately indifferent to Plaintiff's serious medical needs, and Plaintiff has not submitted evidence in his response to create a genuine dispute of material fact on this issue. Therefore, the motion for partial should be granted as to the Eighth Amendment deliberate indifference to serious medical needs claim against defendants Drs. Alley and Naughton.

**C. Psychologist Gamarra-Hoff**

Defendants provide a declaration from Ms. Gamarra-Hoff stating that she recalls speaking to Plaintiff following the assault, and he requested an appointment with the psychiatrist. Shortly thereafter, Ms. Gamarra-Hoff referred Plaintiff for a psychiatry evaluation for medication management and treatment, as she cannot prescribe medication. She also states that she was responsible in 2019, to see Plaintiff every 60 days for mental health check-ins as he was a "psych CAT 2 level" inmate. (Gamarra-Hoff Decl., ECF No. 91-3.) Defendants also provide evidence that Ms. Gamarra-Hoff made a psych referral on October 8, 2019, and Plaintiff was seen and evaluated by psych on November 6, 2019.

The evidence before the court reflects that Plaintiff sent a kite to mental health on September 24, 2019, stating that he was having nightmares, depression, anxiety, and fear of being attacked while sleeping following the assault. (ECF No. 104-2 at 1.) He sent another kite on September 29, 2019, stating that he had been plagued with nightmares, paranoia, depression

and loss of appetite since the assault, and he requested to speak to someone as soon as possible. (ECF No. 104-2 at 3.)

A psych referral was made on October 8, 2019, as a result of Plaintiff's complaints of nightmares, paranoia, sleep, labile mood, and poor concentration. (ECF No. 93-21 at 2.)

Plaintiff sent another kite to mental health on October 28, 2019, stating that he had been having nightmares, extreme bouts with anxiety, depression, and lack of sleep since the assault. He reported that he had spoken to Ms. Gamarra-Hoff, and she was waiting for a response "from your office." He asked for help or an interview as soon as possible. The response states that Plaintiff was scheduled to see Mr. Parento in outpatient mental health on November 6, 2019. (ECF No. 93-22 at 2.)

Plaintiff underwent a psych evaluation on November 6, 2019, where the notes indicate he asked to have his Elavil increased, and he was having trouble sleeping. The notes discuss that he was prescribed Elavil for fibromyalgia, but that Plaintiff would not take medications for his mental health. He had a good and stable mood, though he was only sleeping four hours a night, had mild anxiety and night and occasional nightmares. He was referred to medical to manage or adjust his Elavil and to follow up as needed. (ECF No. 93-23 at 2.)

On December 31, 2019, Plaintiff sent a kite to Ms. Gamarra-Hoff discussing his condition. (ECF No. 104-2 at 5.) On January 26, 2020, he sent another kite to mental health, stating he was noticing problems with his memory and ability to read or write, and was struggling with PTSD issues. (ECF No. 104-2 at 6.)

Plaintiff sent another kite to mental health on April 17, 2020, stating that he was experiencing "extreme" mental problems, and he could not focus or remember things like he

used to, and he was having painful nightmares causing him to worry a lot. He asked to be seen as soon as possible. (ECF No. 104-2 at 7.)

Plaintiff has presented evidence that he continued to send kites to mental health after his November 6, 2019 psych evaluation, including a kite addressed directly to Ms. Gamarra-Hoff, regarding the alleged deterioration in his mental health following the assault. There are no records before the court indicating that Ms. Gamarra-Hoff responded or that Plaintiff was seen by a mental health provider after November 6, 2019 or that he was seen for his 60-day mental health checks. Therefore, Plaintiff has raised a genuine dispute of material fact as to whether Ms. Gamarra-Hoff was deliberately indifferent to Plaintiff's mental health needs. As such, the motion for partial summary judgment should be denied as to the Eighth Amendment claim against Ms. Gamarra-Hoff.

**D. Qualified Immunity**

"In evaluating a grant of qualified immunity, a court considers whether (1) the state actor's conduct violated a constitutional right and (2) the right was clearly established at the time of the alleged misconduct." *Gordon v. County of Orange*, 6 F.4th 961, 967-68 (9th Cir. 2021) (citing *Saucier v. Katz,* 533 U.S. 194, 200-01 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009)).

In light of the recommendations, the court need only analyze the qualified immunity argument as to defendant Gamarra-Hoff. Taking the facts in the light most favorable to Plaintiff, a reasonable fact finder could conclude that Ms. Gamarra-Hoff violated Plaintiff's rights under the Eighth Amendment. Moreover, those rights were clearly established. It has been well established that denying or delaying medical treatment can violate the constitution. *See Stewart*

*v. Aranas,* 32 F.4th 1192, 1195 (9th Cir. 2022) (quoting *Colwell v. Bannister,* 763 F.3d 1060, 1066 (9th Cir. 2014)). Therefore, defendant Gamarra-Hoff is not entitled to qualified immunity.

### IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order that Defendants' motion for partial summary judgment be **GRANTED** as to defendants Drs. Alley and Naughton, and **DENIED** as to defendant Gamarra-Hoff.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: October 27, 2023

                                                             Craig S. Denney
                                                             United States Magistrate Judge